IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 25, 2011 Session

## DONALD L. SEIBER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 89978      Bob R. McGee, Judge**

_____

**No. E2010-00285-CCA-R3-PC - Filed April 19, 2011**

_____

The petitioner, Donald L. Seiber, appeals the denial of his petition for post-conviction relief, arguing that the case should be remanded because the post-conviction court failed to make adequate factual findings and that the post-conviction court erred by denying post-conviction relief. Because the record supports the denial of post-conviction relief, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Gerald Gulley, Knoxville, Tennessee, for the appellant, Donald L. Seiber.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Phillip Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In 2004, a Knox County Criminal Court jury convicted the petitioner of aggravated kidnapping, aggravated assault, and two counts of sexual battery, and the trial court imposed a total effective sentence of 16 years' incarceration. On direct appeal, this court affirmed the petitioner's convictions but remanded the case for resentencing. *See State v. Donald Luke Seiber*, No. E2004-01794-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Knoxville, Oct. 25, 2005) (*Seiber I*).

During the petitioner's trial, the victim, Greta Goswick Miller, who lived with

the petitioner in 2001, testified that on June 2, 2001, the petitioner refused to let her leave his home and that he hit her "with his fists and the gun, threw her on the floor, kicked her, dragged her by her hair, and stomped on her back." *Seiber I*, slip op. at 1-2. The petitioner, who was drinking rum, "put the gun to the victim's head and forced her to drink half of a big bottle of rum in a short amount of time." *Id.*, slip op. at 2. The victim claimed that her drug dealer, a man named Lou, witnessed part of the incident and asked the petitioner to stop but "became scared and left the house." *Id.* On the following morning, the petitioner became "more volatile" after his son asked why he had hurt the victim. *Id.* The petitioner, who remained in possession of the gun, ordered his son to leave and "pushed the victim up against a wall, placed the gun on top of her head, and fired a bullet into the wall right behind her head," rupturing the victim's eardrum. *Id.*

After his son left, "the [petitioner] came into the kitchen and began to lightly slash the victim's face and neck with a steak knife. The [petitioner] then ordered the victim to go into the bathroom, undress, and shave her pubic area." *Id.* "After the victim completed her task, the [petitioner] instructed the victim to sit on the commode while he cut her hair very short with a pair of kitchen scissors." *Id.* The petitioner then ordered the victim "to place one leg on the sink and the other leg on the edge of the bathtub" and placed "the steak knife in the victim's mouth with the tip pointed toward the back of her throat and made her hold it, warning her that if she dropped the knife he would shove it through her neck." *Id.* "The [petitioner], who was wearing heavy work boots, savagely kicked the victim repeatedly between her legs. The victim testified that it was difficult for her to hold onto the knife during the kicking because the abuse was painful." *Id.*, slip op. at 3. The petitioner then "took the knife from her mouth and inserted the full length of the blade into her genital opening, twisting the knife back and forth. . . . The [petitioner] alternated between inserting the knife inside her and kicking her while telling her that he was going to kill her and her family." *Id.*, slip op. at 3.

Following the assault in the bathroom, the petitioner ordered the victim into the livingroom "where he made her sit naked on some broken glass on the floor while she held the knife in her mouth lengthwise." *Id.*, slip op. at 3. The victim was able to escape after the petitioner passed out in a chair. The victim ran from the residence and finally collapsed in the yard of the home of Knoxville Police Department Officer Matthew Cook. *Id.* She told Officer Cook about the assault, and he called an ambulance.

Upon remand, the trial court again imposed a total effective sentence of 16 years' incarceration, but this court modified the sentence to 15 years based upon the holdings in *Blakely v. Washington*, 542 U.S. 296 (2004), and its progeny. *See State v. Donald Luke Seiber*, No. E2006-00816-CCA-R3-CD, slip op. at 8-11. (Tenn. Crim. App., Knoxville, June 7, 2007) (*Seiber II*). Our supreme court denied the petitioner's application for permission

to appeal on September 17, 2007, *see State v. Donald Luke Seiber*, No. E2006-00816-SC-R11-CD (Tenn. Sept. 17, 2007), and the petitioner filed a timely petition for post-conviction relief on September 11, 2008, alleging that he had been denied the effective assistance of counsel at trial.

At the evidentiary hearing, which was conducted in two parts to allow the petitioner more time for the presentation of argument, trial counsel testified that he was appointed to represent the petitioner approximately three months prior to the trial in his case. He stated that he replaced the petitioner's previous counsel, who had been removed from the case because of a conflict of interest. Counsel testified that because the petitioner's was his first major criminal trial, he enlisted the assistance of a more experienced attorney with whom he shared office space. He testified that his co-counsel helped him with trial preparation and handled the cross-examination of the victim at trial. Counsel said that he felt he handled the case "fairly well" because although the petitioner was originally charged with two counts of aggravated rape, especially aggravated kidnapping, and aggravated assault, he was convicted of the lesser included offenses of sexual battery and aggravated kidnapping along with the charged offense of aggravated assault.

Trial counsel described the victim's testimony as "99 percent of the State's case" and said that his strategy was to discredit her testimony that the petitioner held her hostage for the better part of two days by attempting to show that she was seen at places other than the petitioner's residence during that time. He said that the trial court would not permit the defense to present some of that evidence, including a letter written by the victim, but that he was able to present some, including proof that the victim had sought medical treatment on June 2, 2001, unrelated to any injuries she allegedly sustained at the hands of the petitioner. He said that the trial court excluded proof regarding a money order picked up by the petitioner during the time the victim claimed to be held captive because counsel could not properly authenticate the documents. Counsel stated that he could not remember if he had requested a continuance to give him time to obtain proper documentation, but he said that it was his recollection that the trial court "was not happy [the petitioner] had fled the jurisdiction for a year, 18 months, whatever it was, and was not going to listen to any excuses why we needed a continuance or more time, or any expert, or anything, period."

Counsel stated that his "entire case" revolved around attacking the victim's veracity and that, to that end, he attempted to impeach her testimony with a letter she had written to her father during the time she claimed the petitioner held her hostage and attacked her. In addition to the letter, counsel procured the victim's medical records from a nearby clinic establishing that she had visited the facility during the time of the alleged attack. Counsel said that he did not provide any of the evidence to the State in the form of reciprocal discovery because it was the defense "strategy to ambush her with it based on her testimony"

at trial. Counsel said that both he and co-counsel tried on several occasions to get the letter admitted into evidence, but the trial court denied them "every time [they] raised it." Counsel added that at one point, the trial judge "lost his temper" and threatened the attorneys with "contempt because [they] kept trying to argue to get that letter in."

Counsel stated that he was able to impeach the victim's testimony that the petitioner had inserted the knife into her vagina several times via the testimony of the treating gynecologist, who said that there was no physical evidence to corroborate the victim's version of events. Counsel said, "[C]learly the jury believed the treating physician, that there was no knife inserted in her vagina, because they came down from aggravated rape to sexual battery."

Counsel testified that although he could not specifically recall his pretrial discussions with the petitioner regarding whether the petitioner would testify at trial, he did recall that he did not believe that the petitioner should testify. Counsel explained, "I remember at the time my concern with him testifying was . . . his previous statement to the police, whether he could hold up on cross examination from the State, and quite frankly, whether he could hold his temper." Counsel said the petitioner "had some anger management issues" that caused counsel to fear that the petitioner "would lose his temper and help prove the State's case." He said that he was "pretty sure" he had talked to the petitioner about his decision to take the stand "during the trial, and he decided not to testify." Counsel said that the trial court did not follow the requirements of *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), and that he did not correct the trial court on its omission. Counsel explained his reticence, "[A]t that point in the trial we had been beaten down so much by Judge Jenkins, you know, we'd already almost been held in contempt for bringing up the letter. . . . I probably should have forced Judge Jenkins for the record to do a little bit more, but I didn't." Counsel added, however, that he advised the petitioner that the decision whether to testify must be made by the petitioner and that "at the end it was his decision, and he chose not to."

During cross-examination by the State, trial counsel testified that he had "burned through" the allotted 75 hours for which he could seek compensation even before the trial started. He explained, "I turned in my fee claim before everything was done because I knew I wasn't going to get paid any more, and just kept working past that." He added that co-counsel volunteered his services and that he paid co-counsel $500 of his own money "just to say thank you." Counsel said that co-counsel, who handled the cross-examination of the victim, got the victim to admit that she had lied to the police on several occasions and that she had used drugs during the time of the alleged attack. He also got her to admit that she had inflated many of her claims about the attack. Co-counsel also discredited her claims of injury by establishing that there was "little or no blood in that apartment period." In addition,

-4-

counsel established that the victim had escaped from jail shortly before the alleged attack and had stolen her father's car.

Counsel said that the petitioner's son's testimony easily established the convictions of aggravated assault and aggravated kidnapping. He said that he believed the jury returned a verdict of guilty of sexual battery based largely on the photographs of the injuries to the victim's vagina. He explained, "I think what the jury did was they discounted her statement, everything about Saturday . . . [and] found him guilty of putting his hand on her, shooting the gun at the ceiling, keeping her from leaving, and whatever trauma happened after [the petitioner's] son left." Counsel admitted that even if the jury did not believe the victim's testimony that the ordeal lasted from Saturday morning until Sunday evening, there was sufficient evidence that she suffered some trauma on Sunday after the petitioner's son left.

Counsel stated that he discussed with the petitioner the petitioner's right to testify at trial but admitted that he did not want the petitioner to testify because he feared that "if [the petitioner] lost his temper on cross examination . . . the jury would believe he was the type of individual who could do something like this." Counsel said that he was also afraid that the petitioner's testifying would damage the image they had tried to create of the petitioner as a "small old man, that . . . couldn't possibly" have committed the crimes against the victim. He said that, ultimately, it was the petitioner's decision not to testify: "I certainly gave him my opinion that I didn't think it was a good idea, but it was up to him."

The petitioner testified that he was "never really happy" with trial counsel because trial counsel "had a really bad habit of not doing his homework." He said that trial counsel advised him not to testify at trial, saying, "[Y]ou may get more time if you testify." The petitioner claimed that he wanted to testify but did not because trial counsel's advice concerned him. The petitioner said he would have told the jury that he did not hold the victim hostage on Saturday and that he actually left the residence to go to Kroger's to pick up a Western Union check the victim's father had sent to help him care for the victim. He said the victim stayed home because she had sustained injuries to her vagina falling from a bunk bed at the jail. He said he used the money to buy crack cocaine for the victim, who then stayed up for several hours writing a thank you letter to her father extolling the petitioner's many virtues.[1] The petitioner said that he later left the residence to purchase liquor for the

---

[1]The letter, which was exhibited to the petitioner's testimony, is a lengthy letter of apology from the victim to her father. In it, the victim apologizes for using drugs, her recent incarcerations in two different counties, and other past misdeeds. The victim also details her medical problems and asks to be reunited with her son. She only briefly mentions the petitioner, saying that he drinks too much and "picks on" her but that

(continued...)

victim and that while he was gone, she called her drug dealer to come to the house. When the petitioner returned to the house, "she wanted to . . . use the van to go out to the drug people's house." He refused.

The petitioner said that he "wanted to talk a lot" during his trial and that he specifically "wanted to talk about Fort Sanders Hospital." He said that if the jury had heard from "the lady doctor at Park West Hospital" who examined the victim on May 29, 2001, he would be "a free man today."[2] The petitioner admitted striking the victim in the face and pushing her on June 2 or 3, 2001, but he denied inflicting any of her injuries. Basically he maintained that she had cut her own hair and placed the knife in her vagina in a drug-induced fugue. He insisted that the brutal injuries to her genital area happened when she fell from a bunk bed at the jail several days earlier. He said that the lacerations to her face happened when she fell while holding the knife. He claimed that he never held the victim hostage and that she had concocted the charges against him because she was "a snake." He insisted that, had he testified at trial, he would have conveyed to the jury that his only desire had been to help the victim through her drug addiction.

In its written order detailing findings of fact and conclusions of law, the post-conviction court denied post-conviction relief, concluding that trial counsel had not performed deficiently and that counsel had "protected the petitioner's right to decide whether or not to testify."

In this appeal, the petitioner first asserts that the case must be remanded to the post-conviction court for further proceedings because the post-conviction court failed to make adequate credibility determinations. He also contends that his counsel performed deficiently by failing to require the trial court to conduct a thorough *Momon* inquiry.

We view each of the petitioner's claims with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. *Id*. § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on

---

[1](...continued)
living with him is better than living on the street.

[2]Testimony from "the lady doctor" was not presented at the evidentiary hearing, and the petitioner did not elaborate further on what her testimony might have been.

appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Initially, the petitioner argues that because the post-conviction court failed to make explicit findings of credibility, the case must be remanded for further findings by the court. The State argues that the post-conviction court's credibility determinations are implicit in the factual determinations included in the written order denying post-conviction relief.

Tennessee Code Annotated section 40-30-111 requires that the post-conviction court "state the findings of fact and conclusions of law with regard to each ground" via written order. *See* T.C.A. § 40-30-111(b). The petitioner, citing *Pylant v. State*, 263 S.W.3d 854 (Tenn. 2008), insists that the findings of fact must include an explicit determination of the credibility of the witnesses presented at the evidentiary hearing. In our view, the petitioner's citation of *Pylant* is inapt. In *Pylant*, our supreme court held that "[w]hen a petitioner presents at the post-conviction hearing a witness he claims should have been called at trial," the post-conviction court must determine whether the testimony is material and admissible and "whether the witness is credible." *Pylant v. State*, 263 S.W.3d 854, 869-70 (Tenn. 2008). The court did not add to the post-conviction court's duties under Code section 40-30-111 a requirement that the court make explicit written credibility findings for every witness proffered at the evidentiary hearing. The order in this case, which thoroughly details the evidence presented at the evidentiary hearing, the petitioner's claims, and the court's conclusions as to those claims, fulfills the statutory requirements. Although the post-conviction court does not explicitly accredit the testimony of trial counsel, the court's credibility findings are implicit in its findings that trial counsel "developed a theory of defense . . . , that he investigated extensively to gather information about the victim, that he used skillful technique at trial to undermine the victim's credibility, and that he protected petitioner's right to decide whether or not to testify."

The petitioner next claims that his counsel performed deficiently by failing to ensure that the trial court made the necessary inquiries under *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), regarding the petitioner's waiver of his right to testify at trial. The State contends that the trial court's failure to conduct an adequate *Momon* hearing is waived because the petitioner failed to present it at trial or on direct appeal. As to the petitioner's claim of ineffective assistance of counsel related to the inadequate *Momon* hearing, the State asserts that the petitioner is not entitled to relief because the record sufficiently establishes that the petitioner personally waived his right to testify.

We agree with the State that any free-standing claim under *Momon* is waived because it was not presented to the trial court or on direct appeal. *See* T.C.A. § 40-30-106(g). Accordingly, we will address only the petitioner's ineffective assistance claim.

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In *Momon*, our supreme court held that "a criminal defendant's right to testify is a fundamental constitutional right guaranteed both by [a]rticle I, section 9 of the Tennessee Constitution and by the Fifth and Fourteenth Amendments to the United States Constitution. As such, the right must be personally waived by the criminal defendant." *Momon v. State*, 18 S.W.3d 152, 161 (Tenn. 1999). The court then established a "prophylactic" procedure "to ensure that defense attorneys in future criminal cases do not unilaterally deprive criminal defendants of the fundamental right to testify." *Id.* at 162. The court described the procedure to be followed in all cases where the accused does not testify:

At any time before conclusion of the proof, defense counsel shall request a hearing, out of the presence of the jury, to inquire of the defendant whether the defendant has made a knowing, voluntary, and intelligent waiver of the right to testify. This hearing shall be placed on the record and shall be in the presence of the trial judge. Defense counsel is not required to engage in any particular litany, but counsel must show at a minimum that the defendant knows and understands that:

(1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

(2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

*Id.* The court noted that the colloquy should generally be conducted by trial counsel and that "[u]nder normal circumstances . . . the trial judge should play no role in this procedure." *Id.*

In this case, the following colloquy occurred following the conclusion of the State's proof:

> THE COURT: Have you gone into the Momen (sic) decision with [the petitioner]?
> [TRIAL COUNSEL]: Yes, your Honor. We've talked about him not testifying. I'm sorry, is that what you asked me?
> THE COURT: Yes. Yes, that's right.
> [TRIAL COUNSEL]: Yes, we have.
> THE COURT: And he understands that regardless of the wishes of his attorney, he may testify, if he wishes.
> [TRIAL COUNSEL]: Yes, your Honor.

-9-

```
        THE COURT:              But this is his voluntary
decision?
        [TRIAL COUNSEL]:        Yes, your Honor.
        THE COURT:              All right.  Okay.
        [PROSECUTOR]:           Could we get him to affirm
and restate that on the record, too?
        THE COURT:              Mr. Seiber --
        [TRIAL COUNSEL]:        Mr. Seiber, he's asking you
is it your voluntary decision not to testify?
        [THE PETITIONER]:       Not to testify?
        [TRIAL COUNSEL]:        Uh-huh.  You need to tell the
judge so he can hear you.
        THE COURT:              That is your decision, Mr.
Seiber?
        [THE PETITIONER]:       Yes; yes, your Honor, please.
```

This exchange clearly falls short of the *Momon* requirements because the petitioner was not advised, on the record by trial counsel, that the jury could draw no inferences from his declining to testify and that the decision to testify lay solely with him.  Despite these omissions, however, the record supports the conclusion that the petitioner personally waived his right to testify based upon trial counsel's advice that he not do so.  The trial court stated that the decision whether to testify lay with the petitioner and that the petitioner was free to testify regardless of counsel's wishes, and the petitioner stated on the record that it was his voluntary decision to remain silent.  Under these circumstances, we cannot say that trial counsel's failure to adhere to the *Momon* regime deprived the petitioner of his right to testify or affected the outcome of the trial.

Moreover, the petitioner's testimony at the evidentiary hearing supports a conclusion that the petitioner waived his right to testify on the advice of counsel.  Although in the post-conviction hearing the petitioner stated that he wanted to testify at trial so that he could provide the jury with his version of the events, he confirmed that he chose not to testify because trial counsel advised him against it.  Trial counsel candidly admitted that he did not want the petitioner to testify given the petitioner's short temper but stated that he informed the petitioner that it was ultimately his decision to make.  Thus, the record does not preponderate against the post-conviction court's finding that trial counsel adequately protected the petitioner's right to testify and did not perform deficiently in this regard.

Finally, the petitioner has failed to establish prejudice.  The petitioner testified at the evidentiary hearing that, had he testified at trial, he could have told the jury about the many things he had done to help the victim and about the victim's lack of credibility.

Because the petitioner's previous beneficence to the victim is irrelevant to the charged offenses and the victim's mendacity was thoroughly established at trial, the defendant's testimony on these points was not critical to the defense. Furthermore, although the petitioner asserted at the evidentiary hearing that his testifying would have rendered admissible a letter allegedly written by the victim on June 2, 2001, and a Western Union receipt from that same day to establish that the attack did not begin when the victim said it did, the record establishes that the letter contained too much irrelevant, prejudicial information to be admissible and that both pieces of evidence would merely have been cumulative. Trial counsel established via the victim's medical records and testimony from her treating physician that the attack could not have begun during the early morning of June 2, 2001, nor occurred in the manner that she claimed. Clearly, the jury did not believe the victim's testimony that the petitioner brutally raped her with a kitchen knife, because it returned a verdict of sexual battery. Testimony of the petitioner's son established that the petitioner fired a gun over the victim's head, and the petitioner did not contradict this testimony, although he claimed the firing was accidental.

Accordingly, the judgment of the post-conviction court denying relief is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-11-